## E. H. EDRINGTON v. W. P. ROGERS AND ANOTHER.

A conveyance of property, with a knowledge on the part of the purchaser, that the conveyance was made to hinder, delay or defraud creditors is void, under the Statute, as to such creditors, though an adequate consideration be paid by the purchaser.

Although a debtor has a right to prefer one creditor to another, and, by making a transfer of his property to one favored creditor, to defeat another, provided he do so in an open manner, and without any further object than his act, upon the face of it, imports; still the law will not allow a creditor to make use of his demand to shield his debtor from his other creditors.

See this case as to an attempt by the same transaction to obtain a preference from a failing debtor, and to purchase from him property beyond the amount of the debt.

A bill of exception to the action of the Judge in the Court below, in interrupting counsel while arguing the law to the Court, to read to the jury a Statute relating to the matter in controversy, does not disclose matter of which this Court can take judicial cognizance.

Appeal from Washington. Trial of the right of property, levied on by execution in favor of the appellees against William T. Austin and James F. Edrington, and claimed by the appellant. The execution was received by the Sheriff on the 5th of December, 1854, and was endorsed no property of William T. Austin found, and levied on the property in controversy, as the property of James F. Edrington, on the 18th of January, 1855. The testimony was as follows: William B. Anderson testified that he had been J. F. Edrington's Clerk for about two and a half years, that he heard nothing of a sale of the goods by James F. Edrington to E. H. Edrington before the first day of January, 1855, when he was told by J. F. Edrington that he had sold his goods to his brother, E. H. Edrington; that James F. Edrington employed him as clerk to remain in the store for his brother; that in this, James F. Edrington acted as the agent of his brother; that the two brothers Edrington then proceeded to take an inventory of the tsock

which amounted to about $6,000 at cost price; that when taking the inventory, the store door was open and people passing in and out, and were told that James F. had sold the store to his brother E. H. Edrington; that he did not hear the trade made or know anything about it, until he was told, as aforesaid, that James F. Edrington had sold the goods to his brother E. H. Edrington; that he saw no money paid for the purchase; that E. H. Edrington gave his brother, for the goods, an account due him for groceries for Austin & Edrington, of about $1800, with two or three years' interest, amounting to twenty-four or five hundred dollars; an account which he had for clerking for James F. Edrington, for about $1,400; his note for $1,000, due first of January next, and his note for over $900 due the 1st of January next thereafter; that he did not know anything about E. H. Edrington's account against Austin & Edrington, or whether they owed him anything; that James F. Edrington continued in the store and that he was trying to settle up his old business, and sometimes sold goods in the store and slept there.

John R. Bertrand testified, that he knew nothing about the sale of the goods to E. H. Edrington, until the levy of the execution; that the sign of James F. Edrington remained over the store for sometime after the levy; that he had been clerk in the store of Austin & Edrington; that James F. Edrington still remains in the store, and may generally be found there when in Washington; that when E. H. Edrington first came to the country, he brought on a stock of groceries which went into the store of Austin & Edrington, and were of about the value of $1,200, or more, but he did not know the exact amount nor whether he had received pay.

James Nalle testified, that he lived in Washington, and had sold goods there; that he heard of the sale sometime after the 1st of January; that James F. Edrington still continued in the store.

James L. Dallas testified, that he was Sheriff of Washington

county after John H. Day; that plaintiff's execution was placed in his hands —— December, 1854; that he went to Washington twice to levy it; that James F. Edrington was absent both times, and he did not levy it in his absence; that this was in the last of December, and he required an indemnity bond from plaintiffs to levy upon the goods in the store, and that he did not know of any other property belonging to James F. Edrington upon which to levy the execution; that he had four executions against James F. Edrington, the same as in the hands of Day except one; that all were paid except the costs.

W. F. Jarrell testified, that he was the Clerk of this Court (below;) that in October he issued an execution on the judgment in favor of plaintiffs against the defendants, Austin & Edrington; that James F. Edrington took said execution out of the office, and it had not been returned.

John J. Day testified, that he was Sheriff of Washington county before James L. Dallas, the present Sheriff; that a good many executions against Austin & Edrington came to his hands, and that some of them were all paid except the costs and one execution for which he was ruled, and there was a judgment against him for one hundred and seventy dollars.

James F. Edrington, called by defendant, testified, that he was one of the defendants in the execution levied on the goods; that the storehouse now occupied by E. H. Edrington belonged to him, but was under mortgage to secure the payment of a large debt; that on the first of January last, he sold the stock of goods, levied on, to his brother, E. H. Edrington; that the negotiation for the purchase had been pending some time before, and was consummated at that time; that the amount of goods was about $6,000; that the sale by him to his brother was a fair, *bona fide* transaction, and the way in which his brother paid him for the goods was this: E. H. Edrington had an account against Austin & Edrington for about $1,800 for groceries sold them when he first came to the country, and in-

terest thereon for two or three years, and also for his services as clerk in their store, for about one year and interest thereon, making about $500, which two sums he, said James F., had agreed to pay, in the dissolution of the firm of Austin & Edrington ; that his brother, E. H. Edrington, had an account against him for his services as clerk, for about $900, all of which were receipted to him, James F. Edrington, as a part of the consideration for said purchase ; and that for the balance of the purchase money, E. H. Edrington gave his notes, one for $1,000, due 1st January next, and one for about $950, due 1st of January next thereafter ; that he, James F. Edrington, had disposed of about two-thirds of the said notes for the payment of his debts, and that he still held, or at this time controlled the remaining third or balance of said notes; that if his brother, E. H. Edrington, was garnisheed by these plaintiffs, he, E. H. Edrington, could not swear that he was indebted to witness, J. F. Edrington, at this time ; that at the time he, the witness, sold the goods levied on to E. H. Edrington, he told said E. H. Edrington, that he was largely indebted, and could not pay all the debts against him, and Austin & Edrington ; that an execution in favor of these plaintiffs was then in the hands of the Sheriff against him, and that he was determined not to pay the debt of plaintiffs, or any other debt of Austin & Edrington, if he could avoid it ; that at the time of said sale, he, witness, transferred about eighteen thousand dollars' worth of notes and accounts to E. H. Edrington in trust for the purpose of paying his individual debts, and avoiding the payment of plaintiff's judgment and all other debts of Austin & Edrington, which debts he would not pay if he could avoid it, which he told said E. H. Edrington at the time of said transfer ; that the debt of plaintiffs in execution was a fair and *bona fide* debt, and that it was incurred by witness and William T. Austin for a valuable consideration ; that immediately after the plaintiffs in execution recovered their judgment against witness and Austin, witness called on the Clerk of this Court and obtained

from him an execution on said judgment; that it was, at that
time, his intention to cause said execution to be levied on the
homestead of William T. Austin, but that he did not cause said
levy to be made, or deliver said execution to the Sheriff, or
return said execution; that after plaintiffs had their execution
issued, they offered to levy on said Austin's homestead, if wit-
ness would indemnify them, or upon any other property of said
Austin, which witness would point out, and that witness de-
clined either to indemnify or point out; that Austin's home-
stead was, at that time, under a mortgage for a large amount,
and the reason witness would not indemnify, was that he did
not wish to involve himself in a lawsuit; that when he and
William T. Austin dissolved partnership, it was agreed that
each should assume and pay a certain portion of their joint
debts, and that witness has already paid more than his fair
proportion of said debts; that witness was indebted, at the
time of said sale, individually about fifteen or sixteen thou-
sand dollars, but does not know the precise amount; that
when Austin & Edrington received the $1,800 worth of groce-
ries from E. H. Edrington, witness promised to see him paid;
and that when he found himself in failing circumstances, he
felt bound to protect his brother, E. H. Edrington, and prefer
him to other creditors.

The following instruction was given at the request of the
plaintiffs:

That every conveyance of property made and contrived of
collusion, to the intent or purpose to delay, hinder or defraud
creditors of their just and lawful debts, suits or judgments, is
clearly void as to said creditors; and that if James F. Edring-
ton made the conveyance and sale of the goods to E. H. Ed-
rington to delay, hinder or defraud the plaintiffs in the collec-
tion of their judgment, and E. H. Edrington knew of that in-
tent and purpose, and then purchased the goods, although he
may have paid a valuable consideration, the sale was utterly
void.

The defendant asked the Court to instruct the jury:

1st. That any fraud on the part of James F. Edrington cannot affect the rights of E. H. Edrington, if he purchased *bona fide*, and paid a valuable consideration for the goods, and had no part in the fraud.

2d. That if the jury believe that E. H. Edrington gave a valuable consideration for the goods, and paid the full value of the goods for them, that fact rebuts the presumption of fraud on the part of E. H. Edrington, and gives him a good title to the goods purchased.

3d. That the mere fact that a party who sells is in debt will not avoid a sale of personal property, made to another for a full price and valuable consideration.

The 1st and 3d given ; 2d refused.

In addition the Court instructed the jury as follows :

That a debtor may *bona fide* give preference to one creditor over another.

That a judgment creates no lien on pursonal property ; but its liability to execution depends upon its actual condition at the time the levy is made ; but that an absolute conveyance, even for a valuable consideration, if intended by vendor and vendee to deprive existing creditors of satisfaction of their debts, is void as to them.

Fraud is not to be presumed ; it must be proved, but may be shown from circumstances. An intent actually to defraud creditors may be legally inferred from the grantor being insolvent at the time of the conveyance, or so greatly embarrassed or so largely indebted that his conveyance necessarily has the effect to hinder and defraud creditors. The conveyance under such circumstances, to one near kin is looked upon with suspicion by the law.

Verdict and judgment for plaintiffs in the execution. Motion for new trial overruled.

The transcript contained a bill of exceptions as follows :

Be it remembered that on the trial of this cause, while the counsel for defendant was making his opening speech for the

defence, and after the Court had directed the counsel to address all arguments upon matters of law to the Court, and the counsel was addressing the Court upon the ruling in the case of Vickery v. Ward, 2 Tex. R. 212, the presiding Judge interrupted the Counsel and remarked that there was a Statute of the State on the subject of fraudulent conveyances, which had not been read, and he would read to the jury so much as was applicable to this case, and read as follows, viz : (here followed the substance of the first part of the 2nd Section of the Act of January 18, 1840, to prevent frauds and fraudulent conveyances. Hart. Dig. Art. 1452.)

*G. W. Horton,* for appellant.

*W. P. Rogers,* for appellees.

WHEELER, J.   It is not perceived that there is any error in the charge of the Court, or in the giving and refusing of instructions asked by the parties.   The first instruction, given at the instance of the plaintiffs, was clearly correct, and in accordance with the opinion of this Court in the case of Mosely v. Gainer.  (10 Tex. R. 393.)   It was there held, that a conveyance of property, with a knowledge on the part of the vendee, that the conveyance was made to hinder, delay or defraud creditors is void, under the Statute, as to such creditors, though a valuable consideration be paid by the purchaser, and his deed be duly recorded.   "It is certain, (says Judge Story) that a "conveyance, even for a valuable consideration, is not, under "the Statute of 13 Elizabeth, valid in point of law, from "that circumstance alone.   It must also be *bona fide*; for, "if it be made to defraud or defeat creditors, it will be void, "although there may, in the strictest sense, be a valuable, nay, "an adequate consideration.   This doctrine was laid down in "Twine's case, (3 Co. R. 81,) and it has ever since been strictly "adhered to.   Cases have repeatedly been decided, in which

"persons have given a full and fair price for goods, and where "the possession has been actually changed ; yet, being done "for the purpose of defeating creditors, the transaction has "been held fraudulent, and therefore set aside. Thus, where "a person with a knowledge of a decree against the de-"fendant, bought the house and goods belonging to him, and "gave a full price for them, the Court said, that the purchase "being with a manifest view to defeat the creditor, was fraud-"ulent, and, notwithstanding the valuable consideration, void. "So if a man should know of a judgment and execution, and, "with a view to defeat it, should purchase the debtor's goods, "it would be void ; because the purpose is iniquitous." (Story, Eq. Sec. 369, and cases cited.) But such cases are to be carefully distinguished from others, where a sale, or assignment, or other conveyance merely amounts to giving a preference in payment to another creditor. A sale, assignment, or other conveyance is not necessarily fraudulent, because it may operate to the prejudice of a particular creditor. For a debtor may lawfully prefer one creditor to others, by payment of his debt, or by conveying in trust so much of his property as will be adequate for such payment, provided it be done openly and *bona fide*, and assented to and accepted by the creditor preferred. (Id. Sec. 370 ; 5 Mass. R. 144 ; 1 Smith S. C. R. 42.) And accordingly, the Court, in this case, instructed the jury, that a debtor may, *bona fide*, prefer one creditor to others. The law, as applicable to the facts of the case, was thus given in charge to the jury ; and the question of the good faith, or actual intention of the parties to the trasaction was fairly left to their decision.

The Court very properly refused to instruct the jury as requested by the defendant. For that would have been, to withdraw from their decision the question of actual or intentional fraud ; and make their decision turn upon the sole question of the consideration paid for the goods. That, as we have seen, was not the sole question to be considered. For a sale is not,

under the Statute, (Hart. Dig. Art. 1452,) valid in point of law, from the single circumstance of a valuable, or even an adequate consideration. It must also be *bona fide;* and not made with an intent to defraud creditors.

The question for the jury to decide was, whether the transfer of the goods was made to the claimant solely as a favored creditor, and with no other object than the act on its face imported ; or whether the claimant made use of his demand to protect the defendant from the demands of other creditors, and there was a secret trust or understanding that it was for the benefit or advantage of the debtor. For, "although a debtor "has a right to prefer one creditor to another, and, by making "a transfer of his property to one favored creditor, to defeat "another, provided he do so in an open manner, and without "any further object than his act, upon the face of it, imports ; "still, the law will not allow a creditor to make use of his de-"mand to shield his debtor ; and while he leaves him in *statu* "*quo*, by forbearing to enforce the assignment, to defeat the "other creditors by insisting upon it." (Twine's Cases, note 1, Smith's L. Cases, 4 Am. Edit. p. 42.) We see no cause to question the sufficiency of the evidence to warrant the verdict. That the present was not the mere preference of one creditor to another is evident from the fact, that it was not a transfer merely of goods sufficient to satisfy the demands of the vendee and claimant, when from the description of goods it is evident such a disposition was practicable, but it was a transfer of the defendant's entire stock of goods, in value greatly exceeding the demands of the claimant. But we deem it unnecessary to comment upon the evidence. The jury were the judges of the weight to which it was entitled, and the true conclusions of fact to be drawn from it ; and we see no cause to question its sufficiency to warrant their finding.

The bill of exceptions in the record presents no matter, which can properly come under discussion and revision in this Court.

It is scarcely necessary to say, that it is the province of this Court to entertain appeals from the decisions of the District Courts, and to revise their judgments upon the matters of law therein adjudicated, and not upon questions of professional or judicial propriety, or etiquette between the Bench and the Bar. If counsel were interrupted in their argument by the Court, the fair presumption, in the absence of anything appearing to the contrary, is, that the course of counsel gave occasion for the interruption. It is not inconceivable that counsel may have indulged in such a course of remark, as to require the interruption of the Court; and to have rendered the interruption complained of not only proper, but necessary for the maintenance of order, propriety and fairness in the administration of justice. The bill of exceptions does not inform us what was the occasion of the interruption, further than that "the counsel was addressing the Court upon the rulings in the case of Vickery v. Ward, (2 Tex. R. 212,)" when the Court, it seems, interrupted the counsel, reading a part of the Statute of Frauds and the opinion of the Court in that case; as we suppose the Court might very properly do, to arrest an unwarrantable application, or, it may be, a perversion, of the law of the case. Besides, the counsel, it seems, was addressing the argument to the Court; and surely it cannot be supposed that it was improper for the Court to set counsel right upon the law, in order to save them from the embarrassment of occupying a false position in their argument to the jury. It would seem, that it should have been considered the subject rather of satisfaction than complaint. But it will suffice to dispose of the bill of exceptions, that it does not disclose matter which can properly be brought under discussion by counsel here, or of which this Court can take judicial cognizance. We are of opinion that there is no error in the judgment, and it is affirmed.

Judgment affirmed.